## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| RITA PICONE, | ) | CASE NO. 5:22-CV-01339-CEF |
| Plaintiff, | ) | |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | JUDGE CHARLES ESQUE FLEMING |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY ADMINISTRATION, | ) | JENNIFER DOWDELL ARMSTRONG |
| Defendant, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.      INTRODUCTION

Plaintiff Rita B. Picone ("Ms. Picone") seeks judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). (ECF Doc. 1). U.S. District Judge Charles Esque Fleming has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). Pursuant to Local Civil Rule 72.2, this matter was referred to a magistrate judge for preparation of a Report and Recommendation, and it was subsequently reassigned to me pursuant to General Order No. 2022-14. For the reasons set forth below, I RECOMMEND that the Court REVERSE the ALJ's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

## II.     PROCEDURAL HISTORY

1

Ms. Picone filed an application for DIB on July 1, 2019, and an application for SSI on December 19, 2019, both alleging a disability onset date of July 1, 2019. (Tr. 138, 195-96).[1] She later amended the disability onset date to August 5, 2019. (Tr. 138, 162, 467). Her DIB and SSI applications were denied initially and upon reconsideration. (Tr. 248, 253, 261, 264). Ms. Picone requested a hearing before an administrative law judge ("ALJ"). (Tr. 274-75). On June 1, 2021, the ALJ held a video conference due the COVID-19 pandemic, at which Ms. Picone was represented by counsel. (Tr. 156-94). Ms. Picone and a vocational expert testified at the hearing. (Tr. 164-94).

On June 15, 2021, the ALJ issued a written decision finding that Ms. Picone was not disabled. (Tr. 138-49). The ALJ's decision became final on June 3, 2022, when the Appeals Council declined further review. (Tr. 2-4).

On July 29, 2022, Ms. Picone filed her Complaint, challenging the Commissioner's final decision. (ECF Doc. 1). Ms. Picone asserts the following assignments of error:

(1) Whether the ALJ's decision is supported by substantial evidence in the absence of *some* explanation for the exclusion of Drs. Krabbe and Terry's requirement that supervisors deliver work performance criticism/correction in a constructive manner from the RFC finding.

(2) Whether the ALJ's assessment of Plaintiff's mental health symptom allegations complied with the requirements of SSR 16-3p.

(ECF Doc. 6, PageID#1348) (emphasis in original).

## III.    BACKGROUND INFORMATION

### A.  *Personal, Educational, and Vocational Experience*

Ms. Picone was born in 1969, and she was 50 years old at the time of her amended alleged disability onset date. (Tr. 148). She lives with her brother, and she has three adult daughters. (Tr.

---

[1] The administrative transcript is located at ECF Doc. 5 on CM/ECF.

164, 180-81). Ms. Picone has a ninth-grade education, and she does not have a GED. (*Id.*). At the time of the hearing, she had a driver's license. (*Id.*). Her past relevant work was as a health insurance salesperson. (Tr. 148).

**B. *Relevant Hearing Testimony***

**1. Ms. Picone's Testimony[2]**

Ms. Picone testified that she suffers from depression, anxiety, and PTSD, with related symptoms such as nightmares, random flashbacks, and panic attacks that involve chest tightness and difficulty breathing. (Tr. 168-71). She takes psychiatric medications to address symptoms of psychosis, anger, and anxiety. (Tr. 166). She testified that she stopped taking Adderall a few weeks prior to the administrative hearing. (Tr. 165). She also testified she is unable to take her Clonidine medication on a daily basis because she experiences drowsiness. (Tr. 166). She further testified that jumpiness is another side effect of this medication, which results in "feel[ing] like [she is] tired, but [then she] feel[s] like [she's] gonna jump out of [her] skin too." (Tr. 166-67).

Ms. Picone identified arthritis and PTSD as her two most incapacitating medical conditions. (Tr. 167). She stated that being a rape survivor was the source of her PTSD. (Tr. 168). She testified to having nightmares and occasional flashbacks during the day. (Tr. 169). While Ms. Picone reported that she can sleep through the night, she randomly experiences nightmares that cause her to wake up and scream. (*Id.*). She reported only sleeping two to three hours per night. (Tr. 170).

When Ms. Picone experiences a flashback during the day, she testified that it "takes a while" for her to regain composure and return to normalcy because she "sometimes" has heart palpitations and strong anxiety. (Tr. 171). She told her doctor that she experiences chest tightness

---

[2] Because Ms. Picone's assignments of error revolve around the ALJ's assessment of her mental conditions, this summary will be limited to her hearing testimony regarding her mental conditions.

and difficult breathing. (*Id.*). She testified that she gets "bothered" by social situations and settings, so she usually tries to stay by herself. (*Id.*). If she does leave her house, she only leaves when necessary and at night. (*Id.*).

Regarding her activities of daily living, Ms. Picone testified that she currently lives with her brother. (Tr. 177-79). She has problems with driving due to hand numbness and anxiety but can drive short distances. (*Id.*) She also testified that, on a typical day, she tries to maintain her house, sell things on eBay, make simple meals, do laundry, and babysit the grandchildren of her middle daughter as much as possible. (Tr. 177-78, 180). Ms. Picone stated that her eldest daughter no longer speaks with her after her daughter had Ms. Picone involuntarily committed. (Tr. 180). She also testified that her youngest daughter no longer speaks to her. (Tr. 180-81).

## 2. **Vocational Expert's Testimony**

A vocational expert ("VE") testified that Ms. Picone's past relevant work was as a health insurance salesperson (DOT #249.262-010). (Tr. 189). The ALJ first asked the VE to hypothetically consider an individual that can perform light work except with the mental limitations that this individual would be limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; cannot direct the work of others and be responsible for the safety or welfare of others; cannot perform piece-rate work or assembly line work; and would be limited to occasional interaction with others. (Tr. 190). The VE opined that the individual could perform work as a checker (DOT#222.687-010); routing clerk (DOT#222.687-022); sorter (DOT#209.687-026). (Tr. 190-91). The ALJ additionally asked whether jobs would exist if the individual had an additional limitation of being off-task at work for 33% of the day on an ongoing basis due to issues related to Crohn's and decreased stress tolerance. (Tr. 191). The VE responded that there would be no work that would permit 33% of the day off-task. (*Id.*). The VE opined that

4

for a person to maintain any form of competitive employment, they could only be off task no more than 15% of the work time. (*Id.*). The ALJ's final hypothetical question was whether jobs would exist if the individual had the additional limitation of missing one work day per week on an ongoing basis, instead of an off-task limitation, due to the individual's health problems. (Tr. 192). The VE opined that there would be no competitive employment for this individual. (*Id.*).

### C. *Relevant Medical/Non-Medical Opinion Evidence*[3]

#### 1. Bryan J. Krabbe, Psy.D.

On January 4, 2020, Dr. Krabbe conducted a psychological consultative examination of Ms. Picone. (Tr. 623-31). As part of Dr. Krabbe's analysis, he reviewed Ms. Picone's medical records, conducted a medical interview, and performed memory and intelligence testing. (Tr. 623). Dr. Krabbe noted that Ms. Picone's family members encouraged her to seek disability. (Tr. 624). Ms. Picone reported having over 70 jobs and being fired on 10 occasions. (Tr. 625). She also reported difficulty getting along with supervisors and coworkers. (*Id.*).

Ms. Picone took the Wechler Adult Intelligence Scale-IV test during this examination, and she received the following IQ scores: a verbal comprehension IQ of 68, a perceptual reasoning IQ of 71, a working memory IQ of 89, a processing speed IQ of 81, and a full-scale IQ of 71. (Tr. 628). Her full-scale IQ score was consistent with borderline intellectual functioning. (*Id.*). Dr. Krabbe, however, indicated that these results should be "viewed with some caution" because Ms. Picone put forth variable effort completing tasks and was quick to say, "I don't know." (*Id.*). Ms. Picone's auditory, visual, working, immediate, and delayed memory skills were all determined to be in the "extremely low" range. (Tr. 629). Because there were no major inconsistences in the

---

[3] The summary of the opinions will be limited to those opinions regarding Ms. Picone's mental health limitations.

information Ms. Picone provided during the examination, Dr. Krabbe concluded that Ms. Picone's self-reported information appeared to be reliable. (*Id.*).

Dr. Krabbe diagnosed Ms. Picone with the following conditions: major depressive disorder, unspecified trauma and stressor related disorder, borderline intellectual functioning, and unspecified alcohol-related disorder. (Tr. 630). Dr. Krabbe noted that Ms. Picone performed adequately on a task meant to assess her short-term memory, performed below average on a task meant to assess her ability to understand instructions, and was able to effectively complete the evaluation. (*Id.*).

Dr. Krabbe also observed that Ms. Picone had difficult completing both serial sevens and serial threes tasks, which suggested difficulty with maintaining attention and focus. (*Id.*). However, Ms. Picone did not experience difficulty in performing a simple structured task to assess her attention and concentration. (*Id.*). She did not describe a history of problems with attention and concentration within work environments. (Tr. 631).

With respect to Ms. Picone's ability to interact with others, Dr. Krabbe provided the following opinion:

> The claimant described a history of problems with teachers and classmates. The claimant functions within adequate limits of intellectual functioning to understand and respond to supervisor feedback and adequately related to co-workers. On past work performance, she described potential impacts of mental health problems on work performance, which may lead to emotional instability when presented with critical supervisory feedback and difficult developing and maintaining appropriate co-worker relationships. Her longest period of employment at one company was 1 year. She presented as sad and cried during the evaluation, which may affect level of engagement with co-workers and supervisors. She has no regular social interactions outside of her family.

(*Id.*).

Regarding Ms. Picone's abilities and limitations in dealing with normal pressures in a competitive work setting, Dr. Krabbe opined that Ms. Picone's symptoms of depression and PTSD

6

may compromise her ability to respond to workplace pressures, leading to emotional instability and withdrawal. (*Id.*).

### 2. Karen Terry, Ph.D.[4]

Dr. Terry, a state agency reviewing psychologist, reviewed Ms. Picone's medical records at the reconsideration level. (Tr. 221-32). Dr. Terry opined that Ms. Picone had the following severe medically determinable mental impairments: depressive and related disorders, borderline intellectual functioning, anxiety, PTSD, and ADHD. (Tr. 225). Dr. Terry further opined that Dr. Krabbe's opinion was consistent with the record evidence. (Tr. 227).

Dr. Terry also opined that Ms. Picone had moderate limitations in her ability to interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 230-31). With respect to her social interaction limitations, Dr. Terry explained that Ms. Picone could maintain appropriate behavior during occasional, superficial interaction with others. (Tr. 231). Dr. Terry opined that Ms. Picone's psychiatric symptoms are likely to interfere with her ability at times to maintain a friendly demeanor. (*Id.*). Finally, Dr. Terry concluded that, if necessary, criticism and correction of Ms. Picone's work performance should be given in a constructive manner. (*Id.*).

### D. *Relevant Medical Evidence*

In October 2018, Ms. Picone began attending therapy to aid her in leaving an abusive relationship. (*See* Tr. 575). She did not show up for six of her seven scheduled appointments. (Tr.

---

[4] In January 2020, Sandra Banks, Ph.D., reviewed Ms. Picone's medical records at the initial level of the administrative process. (Tr. 197-204). None of the parties appear to dispute those findings. Thus, those findings are omitted from this summary of medical opinions.

571). On May 24, 2019, Ms. Picone reported at her therapy appointment that she had difficulty maintaining employment due to her frequently forgetting things. (Tr. 570).

On June 20, 2019, Ms. Picone established care with a medical provider to re-establish medication management for feelings of depression, poor focus, confusion, anxiety, and paranoid thoughts. (*See* Tr. 562). She reported past psychiatric history of anxiety, depression, and inpatient psychiatric stays. (*Id.*). Ms. Picone's chart also noted a history of para-suicidal cutting behaviors. (*Id.*). She further reported a history of neglect, as well as physical, mental, and sexual abuse. (*Id.*). Her mental status exam revealed depressed and anxious mood and slowed thought process. (Tr. 563). Ms. Picone was diagnosed with depressive disorder, PTSD, generalized anxiety disorder, history of alcohol abuse, and personality disorder. (Tr. 563-64).

Ms. Picone primarily received treatment at Phoenix Rising Behavioral Healthcare & Recovery. On April 7, 2020, Ms. Picone presented for a diagnostic assessment with symptoms of lack of control, hearing and seeing things, and memory problems following a head injury and lack of oxygen due to being choked by her daughter. (Tr. 679). Her mental status exam revealed depressed/anxious mood, flat affect, circumstantial/tangential/loose thought process, auditory and visual hallucinations, delusions, impaired attention/concentration, borderline intelligence, and impaired insight and judgment. (Tr. 684). She was diagnosed with PTSD, ADHD, and major depressive disorder. Ms. Picone's medical providers recommended that she begin therapy and medication management. (Tr. 690-91).

Ms. Picone reported a positive response to her medications on April 28, 2020. (Tr. 658). On May 4, 2020, Ms. Picone told her mental health counselor that her daughter was possessed by a demon, and that Ms. Picone heard growling and grunts coming from her Ouija board. (Tr. 651). She also heard upsetting voices that told her she was not "good enough." (*Id.*). On June 15, 2020,

8

Ms. Picone reported feeling better, but she was unable to remember to take her medications on a regular basis. (Tr. 785-86). On August 17, 2020, she reported that she heard oscillating fans singing to her. (Tr. 769-70). On August 20, 2020, Ms. Picone continued to report hallucinations; specifically; she heard voices when she was near a fan, and she saw lights in the sky that she feared was an alien spaceship. (Tr. 768). On August 27, 2020, Ms. Picone reported that her daughter hurt her and that she was still hearing voices. (Tr. 762).

On September 11, 2020, Ms. Picone reported side effects of depression and feeling "slowed down" from her Aristada[5] injection. (Tr. 756). She further described the side effects of the medication as feeling like she was "crawling out of [her] skin." (Tr. 758). She also reported that she heard whispers and was hopeful that those whispers were her deceased father letting her know he is okay. (*Id.*). Three days later, Ms. Picone reported that she hated her medications because they make her legs and body "restless." (Tr. 747). She told her counselor that she experienced suicidal thoughts but denied suicidal intent. (*Id.*). Her mental status exam was normal with the exception of depressed anxious mood. (Tr. 748).

On September 17, 2020, Ms. Picone informed her mental counselor that she told her daughter about the voices she hears. (Tr. 745-46). Her daughter advised Ms. Picone to admit herself into an inpatient facility for ongoing auditory hallucinations. (*Id.*).

On September 24, 2020, Ms. Picone's mental counselor described her individual progress as "minimal." (Tr. 737). Ms. Picone presented with racing thought process/orientation, and antsy, restless motor activity, and speech. (Tr. 737-38). She further reported that she heard humming and growling, and lights in the sky scared her. (Tr. 740).

---

[5] Aristada is the US brand name for an apriprazole lauroxil extended-release injection used to treat schizophrenia (a mental disorder) in adults. Mayo Clinic,  Apriprazole Lauroxil (Intramuscular Route), https://www.mayoclinic.org/drugs-supplements/aripiprazole-lauroxil-intramuscular-route/description/drg-20406243 (last visited June 21, 2023).

On October 16, 2020, Ms. Picone stopped taking her Aristada injection because she experienced restlessness as a side effect of the medication. (Tr. 994). Her mental status examination noted that Ms. Picone demonstrated anxious mood and circumstantial thought process. (Tr. 994-95). On October 22, 2020, Ms. Picone reported not eating and sleeping. (Tr. 991). She further reported that if she did not make improvements to her home, the county had informed her the home would be condemned. (*Id.*).

On October 27, 2020, Ms. Picone was prescribed Zyprexa, an antipsychotic medication. (Tr. 986). She reported only sleeping two hours per night and feeling irritable. (Tr. 982). On December 1, 2020, Ms. Picone told her counselor that she had a good Thanksgiving but missed seeing her grandchildren, was happy with her case manager, and was utilizing coping skills to deal with her depression symptoms. (Tr. 955). Ms. Picone stated that she made a little progress towards her therapy goals, but not much progress. (Tr. 951). She denied any current suicidal or homicidal ideation, intent, or plan. (Tr. 952).

During her December 17, 2020 appointment, Ms. Picone reported increased memory issues and advised that she lost her state financial support after forgetting an appointment with the Ohio Department of Job and Family Services. (Tr. 949-50). The mental counselor assessed that Ms. Picone had a highly emotional and tearful affect, as well as rushed speech. (Tr. 947).

On January 14, 2021, Ms. Picone was crying at her appointment and stated that she is "going crazy." (Tr. 118). She filed a police report because she believed her ex-partner and his girlfriend were planning to "shoot up her house." (*See id.*). She placed extra lights in her backyard to see if someone was moving around. (*Id.*). She also stated that she was scared and experiencing panic attacks. (*Id.*).

At Ms. Picone's February 2021 appointment, her progress was assessed to be minimal. (Tr. 918). There were no significant changes in her mood/affect, thought process/orientation, motor activity and speech, and behavior/functioning. (Tr. 919).

On March 8, 2021, Ms. Picone reported feeling depressed and stated that her memory was horrible. (Tr. 906). She also reported that she watched her grandchild and lived off her eBay earnings. (*Id.*). She stated that she experienced sleep fluctuations, and that she was not consistently taking her medications. (Tr. 907). She did not report any side effects from her medication at this appointment. (Tr. 910). She indicated that she had a past psychiatric history that included suicide attempts and self-harm such as cutting, but she also stated that she had not attempted suicide as an adult. (*Id.*). The mental status examination revealed that Ms. Picone had an anxious mood, with a full affect, pressured speech, circumstantial thought process, auditory hallucinations, preoccupied/ruminating thought content, impaired attention/concentration, partial insight into her situation, but had no delusions. (Tr. 907). Ms. Picone's counselor diagnosed her with PTSD, recurrent major depression, and ADHD, and advised her to continue taking her psychiatric medications as prescribed. (Tr. 910).

## IV.    THE ALJ'S DECISION

The ALJ first determined that Ms. Picone met the insured status requirements of the Social Security Act through September 30, 2024. (Tr. 140). The ALJ next determined that Ms. Picone had not engaged in substantial gainful activity since August 5, 2019 (the amended alleged onset disability date). (*Id.*).

The ALJ further determined that Ms. Picone has the following severe impairments: cervical spine degenerative disc disease, Crohn's disease with enteropathic osteoarthritis, chronic pain syndrome, fibromyalgia, degenerative joint disease of the right elbow, bilateral carpal tunnel

syndrome, major depression, attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and borderline intellectual functioning. (Tr. 141). The ALJ determined, however, that Ms. Picone does not have an impairment or combination of impairments that meet or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (*Id.*).

The ALJ also determined that Ms. Picone could perform light work with the following limitations: no climbing of ladders, ropes, or scaffolds; occasional climbing of ramps and stairs; frequent stooping and crouching; occasional kneeling and crawling; frequent handling and fingering bilaterally; avoiding workplace hazards such as unprotected heights or exposure to dangerous, moving machinery; no commercial driving; limited to simple, routine tasks that do not involve arbitration, negotiation, or confrontation; no directing the work of others or being responsible for the safety or welfare of others; no piece rate work or assembly line work; and nor more than occasional interaction with others. (Tr. 144).

The ALJ next determined that Ms. Picone is unable to perform any past relevant work. (Tr. 148). He also determined that the transferability of job skills is not material to the determination of disability because using the Medical Vocational Rules as a framework supports a "not disabled" finding regardless of whether Ms. Picone has transferable job skills. (*Id.*). However, the ALJ determined that, considering Ms. Picone's age, education, work experience, and RFC, that there are jobs that exist in significant numbers in the national economy that Ms. Picone can perform, including checker (*Dictionary of Occupational Titles* (DOT) # 222.687-010); routing clerk (DOT #222.687-022); and sorter (DOT #209.687-026). (Tr. 148-49). Accordingly, the ALJ determined that Ms. Picone was not disabled. (Tr. 149).

## V.    LAW AND ANALYSIS

12

A. *Standard of Review*

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (en banc)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); see also 42 U.S.C. § 405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently[.]" *Cutlip*, 25 F.3d at 286; *Kinsella v. Schweiker*, 708 F.2d 1058, 1059-60 (6th Cir. 1983).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

13

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (alteration in original)).

### B.  *Standard for Disability*

The Social Security regulations outline a five-step sequential evaluation process that the ALJ must use in determining whether a claimant is disabled: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. § 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform her past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The claimant bears the ultimate burden of producing sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a). Specifically, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.*

### C.  *Analysis*

Ms. Picone asserts two assignments of error: (1) the ALJ's RFC determination is not supported by substantial evidence because the ALJ's 16-3p assessment included inaccurate

reasoning and mischaracterization of the evidence; and (2) the ALJ's RFC determination is not supported by substantial evidence because the ALJ failed to provide some explanation for the omission from the RFC of a state agency opinion that Ms. Picone required constructive criticism from supervisors.

### 1. ALJ's 16-3p Assessment of Ms. Picone's Mental Health Symptoms

Ms. Picone argues that the ALJ's decision is not supported by substantial evidence because the ALJ's evaluation of Ms. Picone's mental health allegations is not supported by the underlying record. (ECF Doc. 6, PageID#1351-57). She raises three sub-claims: (1) that the longitudinal record does not support the ALJ's conclusion that her mental health treatment notes indicate a lasting positive response to counseling or medication management; (2) the ALJ failed to consider the reasons for Ms. Picone's noncompliance with her psychiatric medication as required by SSR 16-3p; and (3) the ALJ failed to take into account her family member's encouragement that she should seek inpatient psychiatric hospitalization. The Commissioner argues the ALJ articulated valid reasons for discounting Ms. Picone's subjective symptoms. (ECF Doc. 8, PageID#1373-79). Alternatively, if some reasons were not valid, the Commissioner maintains that the ALJ offered other valid reasons to support his RFC determination. (*Id.*). I find that the Ms. Picone's assignment of error is well-taken because the ALJ mischaracterized the evidence, and the longitudinal record does not support the ALJ's evaluation of Ms. Picone's mental health symptoms.

An individual residual functional capacity (*i.e.*, the most an individual can still do despite applicable limitations) is an administrative decision reserved for the ALJ. 20 C.F.R. § 1546(c). The ALJ assesses an individual's RFC based on all relevant evidence of record. 20 C.F.R. § 404.1545(a)(1). It is well-established that an ALJ need not discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir.

2016) (citing *Thacker v. Comm'r of Sec Sec.*, 99 F. App'x 661, 665 (6th Cir. May 21, 2004)) (finding an ALJ need not discuss every piece of evidence in the record). But courts do not hesitate to remand where an ALJ selectively considers only portions of the medical evidence that place that claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability. *See, e.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *see also Ackles v. Colvin*, No. 3:14CV00249, 2015 WL 1757474, at *6 (S.D. Ohio Apr. 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Ms. Picone argues that the ALJ mischaracterized the fact that she managed to avoid inpatient psychiatric hospitalization. (ECF Doc. 6, PageID#1356). Specifically, she cites a treatment note that her family members urged her to commit herself to a psychiatric hospital during the relevant time period. (Tr. 745-56). But this sole treatment note does not demonstrate the ALJ's statement was inaccurate. Indeed, there is *no* evidence of psychiatric hospitalization in the record. Even if a family member encouraged Ms. Picone to seek hospitalization, she fails to demonstrate how the ALJ's statement regarding her lack of psychiatric hospitalization was inaccurate. In other words, Ms. Picone has not shown there was an actual psychiatric hospitalization. *Coyer v. Comm'r of Soc. Sec.*, No. 2:18-cv-336121, 2019 WL 3361261, at *6 (E.D. Mich. July 9, 2019), *report and recommendation adopted*, 2019 WL 3342633 (E.D. Mich. July 25, 2019) (finding that records reflecting that claimant had considered or asked for inpatient psychiatric hospitalization did not

16

render ALJ's statement regarding claimant's lack of hospitalization inaccurate because claimant had not shown there was an actual psychiatric hospitalization).

Ms. Picone's argument that the ALJ mischaracterized the evidence regarding compulsions, cutting, and cognitive disorder is similarly unavailing. (ECF Doc. 6, PageID#1357). She points to notations in the record that she experienced compulsive hair pulling and cutting behavior and asserts this activity occurred during the relevant time period. (Tr. 748-49). Yet, her argument overlooks the fact that this behavior did <u>not</u> occur during the relevant period. In fact, a review of Ms. Picone's citation to her medical records reveals that this behavior was noted in the past psychiatric history section of her treatment notes, not her contemporaneous record. (*Id.*). Additionally, the ALJ's decision did discuss this past psychiatric history to an extent by observing that Ms. Picone had "a history of suicide attempts/self-harm such as cutting, but had no suicide attempts as an adult." (Tr. 14 (citing Tr. 907)). Significantly, Ms. Picone fails to point to any evidence during the relevant time period that demonstrate any such compulsions. (*See generally* ECF Doc. 6, PageID#1357).

But the ALJ did mischaracterize the evidence or provide inaccurate reasoning regarding Ms. Picone's delusions. The ALJ determined that Ms. Picone's subjective mental health symptoms were inconsistent because she presented to her mental health providers "***without evidence of, delusions***, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation or other serious issues." (Tr. 147) (emphasis added). This determination, however, is contradicted by the record, which reveals that Ms. Picone experienced recurrent auditory/visual hallucinations.

For example, Ms. Picone reported on May 4, 2020, that her daughter was possessed by a demon and that she heard growling and grunts from her Ouija board. (Tr. 651). She also reported hearing upsetting voices that told her she is not "good enough." (*Id.*).

17

On August 17, 2020, Ms. Picone reported that her oscillating fans were singing to her. (Tr. 769-70).

On August 20, 2020, Ms. Picone reported hearing "a humming that sounds almost like a conversation," especially when she was near a fan. (Tr. 768). She told her counselor that she sees lights in the sky at night and fears that it is an alien spaceship. (*Id.*). Ms. Picone again reported that she was hearing voices. (Tr. 762).

On September 17, 2020, Ms. Picone told her daughter about hearing voices, and her daughter advised that Ms. Picone should admit herself into an inpatient facility. (Tr. 745-46).

On September 24, 2020, Ms. Picone reported that she heard humming and growling sounds. (Tr. 740). She also reported that she saw lights in the sky that scare her. (*Id.*).

Finally, on January 14, 2021, Ms. Picone filed a police report because her ex-partner and his girlfriend allegedly threatened to "shoot up her house." (Tr. 935). She reported that she placed extra lights in her backyard so that she could see if someone was there. (*Id.*). Accordingly, rather than an absence of delusions, there is ample record evidence demonstrating a "medley" of auditory/visual hallucinations. (*See* ECF Doc. 6, PageID#1356).

However, an ALJ providing one inaccurate reason may be harmless error where the ALJ articulated other valid reasons for discounting a claimant's subjective complaints. *See Garcia v. Comm'r of Soc. Sec.*, No. 1:16 CV 2682, 2018 WL 838371, at *12 (N.D. Ohio Feb. 12, 2018) ("The undersigned finds, however, that even if this reason lacks support in the record, it is harmless because the ALJ's other reasons provide substantial evidence."). Thus, I will determine whether the ALJ's additional reasons serve as sufficient support for his subjective symptoms analysis. Here, the ALJ offered the following other reasons: (1) Ms. Picone admitted seeing a positive response

18

to her counseling session and psychotropic medications, despite her issues with not consistently taking her medications; and (2) she reported mild to moderate level symptoms to providers.

The additional reasons provided by the ALJ do not support adopting a harmless error approach because the ALJ's conclusion that Ms. Picone reported seeing a positive response to her counseling sessions is problematic. I agree with the Commissioner that the ALJ appropriately relied on objective medical evidence (*i.e.*, the reports from Ms. Picone's counselors), and Ms. Picone fails to demonstrate otherwise. (ECF Doc. 6, PageID#1354; ECF Doc. 8, PageID#1376). However, the ALJ's reasoning is problematic because the same treatment notes that report Ms. Picone's positive responses also include the omitted reports of hallucinations. (*See, e.g.*, Tr. 768 (reporting seeing lights in the sky that she believes to be an alien spaceship); Tr. 757 (reporting that she hears humming and whispering and that she believes "it's her dad letting her know he's ok"); Tr. 745 (reporting that she told her daughter about the voices she hears); Tr. 740 (reporting that she still hears humming and growling)). Moreover, despite some notes from mental counselors that Ms. Picone responded positively to treatment, a review of several of these treatment notes reveal that these same counselors assessed Ms. Picone's individual progress as either "no progress" or "minimal progress." (Tr. 68, 72, 97, 102, 114, 119, 671, 675).

Here, the ALJ failed to acknowledge Ms. Picone's recurrent complaints of hallucinations and also omitted notes regarding the status of her individual progress. Without discussing those complaints or the related evidence, the ALJ nevertheless concluded that Ms. Picone's allegations were not entirely consistent with her medical records, in relevant part, because she admitted to seeing a positive response to her counseling sessions and psychotropic medications; there was no evidence of delusions, obsessions, compulsions, cognitive disorder, current suicidal/homicidal ideation, or other issues, and that she reported "mostly mild to moderate level symptoms to

19

providers at Phoenix Rising and during her psychological consultative examination with Dr. Krabbe." (Tr. 147).

Therefore, the ALJ inaccurately characterized the nature of the evidence. Specifically, it is unclear how the ALJ could characterize Ms. Picone's symptoms as "mild to moderate" where the ALJ failed to discuss Ms. Picone's reports of auditory/visual hallucinations. Nor did the ALJ provide—or the Commissioner point to—any discernible rationale or discussion supporting the ALJ's conclusion that Ms. Picone reported "mild to moderate symptoms." *See Stidom v. Comm'r of Soc. Sec.*, No. 5:21-cv-211, 2022 WL 1651393, at *15 (N.D. Ohio May 10, 2022), *report and recommendation adopted*, 2022 WL 1641878 (N.D. Ohio May 24, 2022) (finding ALJ's characterization of "mild to moderate" mental health symptoms inaccurate where ALJ omitted complaints of claimant's dissociative symptoms and objective evidence of personality shifts and symptomatic mental status examinations); *McCormick v. Comm'r of Soc. Sec.*, No. 5:20-cv-2510, 2022 WL 465433, at **19-20, 28-29 (N.D. Ohio Jan. 27, 2022), *report and recommendation adopted*, 2022 WL 462936 (N.D. Ohio Feb. 15, 2022) (finding that RFC was not supported by substantial evidence where ALJ mischaracterized medical records involving claimant's schizoaffective symptoms of hallucinations and reported daily activities).

And while the ALJ appropriately noted that Ms. Picone "admitted seeing a positive response to her counseling sessions," a review of the medical evidence demonstrates that the ALJ appeared to ignore evidence of Ms. Picone's hallucinations and even mental health counselor's notes that she experienced minimal to no individual progress at several visits, despite reportinga positive response to her counseling sessions. Thus, the ALJ's conclusion that Ms. Picone had mild or moderate symptoms does not appear to be accurate based on a review of the evidence as a whole.

Where an ALJ's stated reasons for making a determination are inaccurate or based on a mischaracterization of the evidence, courts have repeatedly held that the ALJ failed to build an accurate and logical bridge between the evidence and the result. *See, e.g.*, *Stemple v. Kijakazi*, No. 1:20-CV-485, 2021 WL 400411, at *8 (N.D. Ohio Sept. 7, 2021) (inaccurate description of opinions' findings); *Muhammad v. Comm'r of Soc. Sec.*, No. 1:16-CV-2569, 2017 WL 4872668, at *9 (N.D. Ohio Oct. 10, 2017) (inaccurate reasons for discrediting medical findings), *report and recommendation adopted*, 2017 WL 4844042 (N.D. Ohio Oct. 26, 2017). While an ALJ does not need to discuss every piece of evidence in the record, the ALJ mischaracterized the records he did cite, which has the effect of casting Ms. Picone in a more capable light than may be wholly accurate. This evidence, if accepted, could change the analysis of Ms. Picone's residual functional capacity. Thus, I recommend that the Commissioner's decision be reversed and remanded for further proceedings.

2. **ALJ's Exclusion of Supervisory Feedback Limitation**

Ms. Picone also argues that the RFC determination is not supported by substantial evidence because the ALJ did not include all the limitations assessed by the state agency psychological consultants, despite finding their opinions persuasive. (ECF Doc. 6, PageID#1349-51). Specifically, Ms. Picone asserts that Drs. Krabbe and Terry determined that Ms. Picone had limitation in her ability to receive feedback or criticism from supervisors and, as a result, opined that she required a limitation where supervisors should only provide work performance criticism/correction in a constructive manner. (*Id.* at PageID#1350 (citing Tr. 231, 244, 631)). Although the ALJ determined that the state agency opinions were persuasive, Ms. Picone argues that the ALJ omitted the constructive feedback limitation and failed to provide any explanation for this exclusion. (*Id.*). Because the state agency opinions contradict the RFC determination and the

ALJ failed to explain this contradiction, Ms. Picone asserts that remand is required for further explanation regarding whether the RFC is supported by the record. (*Id.* at PageID#1351).

An ALJ is not required to adopt every opined limitation from a state agency psychologist. In fact, the Sixth Circuit has recognized that "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency psychologist's opinions verbatim; nor is the ALJ required to adopt the state agency psychologist's limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015). Specifically, the Sixth Circuit determined in *Reeves* that, although the ALJ afforded great weigh to the consultant's opinions, only one of the two state agency consultants described the limitation, and the limitation lacked substantial support elsewhere in the record. *Id.*

But generally an ALJ must build an "accurate and logical bridge" between the evidence and his conclusions. *Ripley v. Comm'r of Soc. Sec.*, 415 F. Supp. 3d 752, 767 (N.D. Ohio 2019). To determine whether an omitted limitation is error, the pertinent question is "whether the medical evidence compels a specific, concrete restriction on the claimant's ability such that the ALJ was required to include it in the residual functional capacity or explain its omission." *Kreilach v. Comm'r of Soc. Sec.*, 621 F.Supp.3d 836 (N.D. Ohio 2022) (citing *Walker v. Saul*, No. 1:20-cv-0504, 2022 WL 1134300, at *4-5 (N.D. Ohio Apr. 18, 2022)).

In *Overstreet v. Saul*, No. 1:20-CV-00645, 2021 WL 5017754, at *15 (N.D. Ohio May 17, 2021), the court determined that a state agency psychologist's opinion that a claimant necessitated a limitation that supervisors should offer positive feedback when merited and constructive criticism when necessary was meritless. In reaching this conclusion, the court determined that this opinion was not a "concrete limitation" on the claimant's ability to work and was "merely an

observation of the best environment for [the claimant]." *Id.* As in *Overstreet,* the ALJ here did not err by failing to explain why this limitation was omitted.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court REVERSE the ALJ's decision and REMAND this case to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated: June 23, 2023                                        s/ *Jennifer Dowdell Armstrong*
                                                             Jennifer Dowdell Armstrong
                                                             U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may forfeit the right to appeal the District Court's order. *Berkshire v. Beauvais*, 928 F.3d 520, 530-531 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).